In re BENSEL et al.

(Supreme Court, Special Term, Ulster County. December, 1909.)

1. EMINENT DOMAIN (§ 230*)—COMMISSIONERS OF APPRAISAL—COMPENSATION.

Commissioners of appraisal in condemnation proceedings under Laws 1905, c. 724, for land for an additional water supply for New York City, should not be allowed $50 per day for all kinds of service; but not to exceed $10 to $25 per day when traveling only, not to exceed $35 per day for examining the premises, not to exceed $40 per day for executive sessions, and not to exceed $50 per day for taking testimony.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 584; Dec. Dig. § 230.*]

2. EMINENT DOMAIN (§ 230*)—COMMISSIONERS OF APPRAISAL—"NECESSARY EXPENSE"—AUTOMOBILES—"NECESSARY TRAVELING EXPENSE."

The use of automobiles by commissioners of appraisal in condemnation proceedings is not a "necessary expense" or "necessary traveling expense," which under Laws 1905, c. 725, § 5, and chapter 724, § 32, is to be allowed them, there being railroads, on which many trains run, going very near all parts of the lands, and livery teams being accessible; the statute contemplating the ordinary method of travel.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 584; Dec. Dig. § 230.*

For other definitions, see Words and Phrases, vol. 5, pp. 4715, 4716.]

3. EMINENT DOMAIN (§ 230*)—COMMISSIONERS OF APPRAISAL—ALLOWANCE OF EXPENSES.

Where the expense of travel submitted by commissioners of appraisal for allowance consists of automobile hire, the court, on disallowing the same as improper, cannot allow what would have been the proper expense for car fare and horse hire. It can only pass on the expense submitted.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 584; Dec. Dig. § 230.*]

In the matter of the application and petition of John A. Bensel and others, constituting the Board of Water Supply of the City of New York, to acquire real estate for and on behalf of the city under Laws 1905, c. 724, and the acts amendatory thereof, in the towns of Olive and Hurley, Ulster county, for the purpose of providing an additional supply of pure and wholesome water for the use of the city Ashoken reservoir, section 13. Heard on application for compensation and expenses of the commissioners of appraisal on rendering their second separate report. An allowance ordered.

Charles W. Mead, for Commissioners.

Archibald R. Watson, Corporation Counsel, for Oliver B. Goldsmith.

BETTS, J. This is an application to tax the compensation and expenses on behalf of these commissioners for work connected with their second separate report. The report embraces 15 parcels. The number of days claimed to have been employed is 53. These days are claimed to have been devoted as follows: In taking testimony and actual trial of claims, 21 days; viewing premises reported on, 12 days; executive sessions, preparing report, and passing upon awards, etc., 19 days; adjournment, 1 day. No fixed amount for compensation is asked for in the bill as submitted, but with the bill the commissioners submitted a proposed order in which they had inserted their compensation at the rate of $50 a day for 53 days, or $2,650 apiece, and allowed themselves the full amount of their expenses, including certain automobile hire which will be hereinafter referred to. It is conceded that June 4, 1909, included in this bill was paid for by the city on the first separate report.

The corporation counsel objects to any allowance for automobile hire, and objects to so many as 12 days for viewing the premises and 19 days for considering the awards and preparing report. My attention has been called to so many opinions of judges somewhat divergent as to what had been held and as to what should have been held in matters of this kind that I have concluded to go very briefly into the history of the Ashokan matters so far as this district is concerned in relation to the compensation and expenses of commissioners only. There are several applications now pending before me for taxation of fees and expenses of other commissions, and the reasons herein given for the action taken will apply equally to them, and will not be repeated. In fact, some of the reasons hereinafter referred to as being advanced for favorable action on automobile bills were urged by other commissions, and not by this one. The commissions Nos. 1 to 9, inclusive, of the Ashokan reservoir, and from Nos. 3 to 5, inclusive, of the Catskill aqueduct, Northern Department, were appointed by me, beginning in April, 1907, some time before any commissioners were appointed by any other of the justices in this district. The first that I recall of an application for the taxation of compensation and expenses was by commission 3 (one of the first commissions appointed by me) of the reservoir section some time in the early part of the year 1908. It was urged then by the corporation counsel that no per diem rate should be fixed, as it is urged now, and that all services were not entitled to the same rate of payment, and that the court should take into consideration generally the nature, character, and extent of the work that was performed by the commissioners. While this was done by me, yet the number of these commissions and the fact that they were to make more than one report apiece led me early to conclude that it would be necessary, confidently assuming that the commissioners that I appointed would render fair and honest service for which they would ask compensation, that some rule more or less uniform should be fixed which would be the maximum allowance by me for

their services.  This I fixed as follows: Organization and the taking of testimony concerning the title and value of the various parcels of land; at $50 per day; for what has been variously called executive sessions, consultations, examining statutes and decisions, making up awards, making up reports, reading testimony, and matters of that kind, $40 per day; for examining the premises a reasonable number of days, $35 per day; for traveling when necessary on days that no other work was done, from $10 to $25 per day.  There were no adjournments as I recall in that case, section 3, but later on there were, and the maximum amount therefor when necessary was fixed at $25. Without any announcement to commissioners or any one else until arriving at my decision in this matter, these figures have been recognized by me as the maxim allowances for the different kinds of work referred to, and the decision has been always announced and the order entered for a lump sum for each commissioner without specifying the amount of compensation per day or the number of days allowed.  The $50 a day for organization and trials only was established from the fact that I understood the first compensation in the Ninth judicial district was fixed at that amount for all services, and from the further fact that it was understood generally that the amount of compensation at that time to counsel selected by the city of New York to try cases here was $50 a day, and from the further fact that many of the men I had selected for commissioners were lawyers and other professional men worthy of and earning a good compensation in their individual business, embracing many who had been honored by different sized constituencies in important official positions and positions of trust, including two former justices of the Supreme Court, several county judges and other officials, and those who were not professional men were bankers, merchants, farmers, manufacturers, and men who had been successful in the various vocations in life in which they were engaged.  These positions were not intended by me as sinecures, nor were they.  These commissioners were made judges to pass upon important rights affecting principally the people of Ulster county and the city of New York, most of them appointed without any request upon the part of themselves or their friends for such position, and without any knowledge that they were to be appointed until the appointment was in fact made.  Such men deserved fair, reasonable payment, and I intended, if the application for the allowance of their compensation came before me, that so far as I might they should get such payment, neither exorbitant nor niggardly.  These commissioners have not asked nor demanded more, nor has New York City so far as I know seriously objected to the allowances made, at least there have been no appeals from my allowances by either the commissioners or the city of New York, nor has any commissioner resigned because his allowance was insufficient.  The amounts less than $50 per day were fixed by me not altogether arbitrarily, but because the kind of service was worth less, and because I thought it all such services were reasonably worth. Under this schedule so arranged, the average compensation to commissioners for a fair day's service was about $40 per day.  The figures in above schedule have not been exceeded, but they have been, and, if the necessity again comes, will be materially reduced.

In February, 1909, application was made by the board of water supply of the city of New York to Justice Howard for appointment of two commissions, which he did. Thereafter and in the spring of 1909 seven commissions were appointed by Mr. Justice Fitts and one other, commission No. 14, by myself. The practice has grown up here of applying to the justice who appointed the commissioners for confirmation of their report when made and for the taxation of their compensation and expenses. Thus it was that in June of 1909 application was made to Justice Howard to tax the compensation and expenses of one of his commissions, and he for the first time in this judicial district fixed the compensation of these commissioners for all kinds of service for 38 days at $50 per day ($1,900) for two of them, and the third of them, 37 days at $50 a day ($1,850), and allowed their expenses in full. This was a new departure in this judicial district, was of interest to the other commissioners, and was known by them as "$50 straight." Later, and in November, 1909, the same commission made a further report which was confirmed by Justice Howard by an order bearing date December 6, 1909. This compensation was also fixed at $50 a day for 58 days' services of all kinds, and each commissioner was allowed $2,900 and his expenses in full. In the meantime various matters intervened, including a general election in the early part of November in New York City and a change of administration, which went into effect on the 1st day of January, 1910, and shortly thereafter an opinion was handed down by Justice Howard taxing compensation and expenses for his second commission on its first report. Many things were said in that opinion, one of which was that $50 a day was "an amount which has come to be regarded as the fixed and regular compensation for commissioners sitting upon the Catskill project." In this the learned justice fell into error so far as the allowances were taxed in this district, as the most of the allowances were made by me up to that time and taking them by a per diem ratio they are principally a little under $40 per day, or about that sum. The justice further says:

"In fixing the amount to be allowed to them, I have proceeded upon the theory that they should be given compensation at the established rate for most of the days when they were actually present in Ulster county, either in session, taking testimony, or viewing property, and for some of the time spent in what they style 'executive sessions' $50 a day substantially has been fixed by so many of the other justices as the per diem compensation for these Ashokan commissioners that I am neither willing nor inclined to disagree with those justices so long as an honest day's work is done for the money. If expedition and integrity, instead of slothfulness and rapacity, were the law of the Ashokan Valley, no fault would be found with the daily wages paid."

Very many other matters are referred to in the opinion, and I gather from a reading of the entire opinion that the learned justice reduced the number of days to correspond with his idea of what was proper work for $50 a day, and he eventually allowed them $2,200, each being $50 per day for 44 days. This was in January, 1910, or thereabouts.

In the meantime some of the commissions appointed by Justice Fitts were making reports, and their fees and expenses being taxed; one

commissioner from Chemung county being allowed expenses at the rate of $924.05 for 81 days or over $11 per day. This particular commissioner's compensation, however, was not allowed at the rate of $50 per day, but substantially all the others were. In July, 1909, two of the commissioners in section No. 12 were allowed over $50 per day, the third commissioner a little under $50 per day by Justice Fitts. In August, 1909, this commission No. 13 was allowed compensation at $50 per day for all kinds of services and their expenses in full by Justice Fitts. This rate—i. e., $50 per day "straight"—was practically followed by Justice Fitts during his lifetime, and New York City apparently approved of large allowances during the year 1909, as it was proposed to appoint three new commissions after the November, 1909, election and application was noticed for Justice Fitts Special Term, December 27, 1909, on short notice of three weeks, and, when I was designated to hold that term, the application was both attempted to be withdrawn by the city and also denied by me. Justice Fitts died in December, and this particular commission whose bills I am now passing upon had noticed this application for taxation at a Special Term which was assigned to be held by him, but which owing to his death I was later designated to hold. This was December 27, 1909, and, before I had reached a decision in the matter, the corporation counsel office asked permission to file affidavits in opposition which has been done, and the matter is now before me for adjustment.

I am not inclined to follow the precedent first set by Justice Howard in this judicial district and followed by Justice Fitts of allowing these commissioners $50 per day for all kinds of service. It seems to me that the rate that I had previously fixed as a maximum is certainly large enough without increasing it. I have taken into consideration the nature, character, and extent of their work, and the time that they have given to the same. The work during 1909 is costing the city of New York more than it did prior to that year, while it should cost less. One of the reasons why it should cost much less is that, when the first commissions began their work, the work was all new here. Lawyers for the landowners and lawyers for the city contended very strongly and stubbornly every step of the way. Questions were litigated to extreme lengths, but some little time before the appointment of these new commissioners in 1909 most of these questions had been decided by the appellate courts. During the year 1909, however, many more witnesses have been sworn on an ordinary piece of property than was the rule prior thereto. Many strange people were brought here by the city of New York in 1909, and shown where the Ashokan reservoir section was by some of our citizens. Later they were brought in before the various commissions and testified to the values of pieces of real estate in that section. Many of these citizens were from counties in the western part of the state, and had never been in Ulster county before or within the Ashokan region, were not real estate experts, and had no actual knowledge of values here prior to 1909. A few of the former real estate experts from this county were apparently dropped to make places for these newcomers, but for the most part they were simply added to the other experts, and,

so far as could be seen, placed an additional burden on New York City. (I am not now in any way referring to engineers or actual experts on water power and such subjects.) The number of these strangers apparently caused the landowners to offer an additional number of witnesses from Ulster county which also had to be paid by the city. The result was that many additional witnesses were sworn on both sides, taking additional time for the commissioners to hear and examine the testimony, and made great additional expense to the city of New York, which had not only to pay their own additional witnesses thus brought here, but also to pay an additional number of our own citizens who were thus brought into these cases to meet these new witnesses. During 1909 also there were so many commissions engaged in hearings and so few attorneys to appear before them and perhaps for other reasons that much shorter sessions were held by many commissions than was the practically universal rule in 1907 and 1908. It is extremely difficult for a court to say, in the absence of proof that any of these commissions refused to go on when either the claimants or the city were ready to proceed with the trial of their cases, that these short sessions were the fault of the commissioners. I shall, of course, refuse to allow for a full trial day when it is called to my attention that any commission deliberately set down a case for 3 o'clock p. m., or declined to go on during the usual hours of a court day when parties were ready without some good and sufficient reason therefor. Liberal allowances will be made by me only where it is apparent that commissions are willing to devote the usual court hours to this work. I think as a general proposition that the time of competent commissioners is well spent in personal examination of the premises. Indeed, they are compelled to do that and to rely on their own judgment when the testimony of values differ so widely as they do in many of these cases. This is, of course, liable to abuse as are all the other days employed, and it may be that this commission could have satisfied their consciences by examining more than one parcel each day, and by spending less time in executive sessions and considering awards. I do not understand that New York City objects to fair pay for these commissioners considering the nature and extent of their work. I think that these commissioners can in their future labors shorten quite appreciably the number of days for viewing premises and for executive sessions and kindred matters.

The commissions also after a statement of the amount of their other expenses for various things say as follows:

"And deponents further say that, during their term of service as expressed in their first and in their second separate reports, it was necessary to employ automobiles with chauffeurs for the purpose of visiting the premises which were the subject of these reports, and inspecting the same; that bills for the respective services rendered by such chauffeurs have been presented to the commission, the aggregate amount of which is the sum of $460, and that the charge made by the chauffeurs in each case is in the opinion of deponents just, fair, and reasonable, and such bills should be paid, and deponents therefore ask that an order of the court be made directing that the amount so claimed be transmitted to Mr. A. Winthrop Williams, at Highland, N. Y., a member of this commission, for payment to the several claimants for their respective services."

124 N.Y.S.—46

This bill for automobiles is objected to by the city of New York because it is not itemized, and because it is not necessary.   I have examined the map in this section, and find that there is a station, Olive Branch, upon the Ulster & Delaware Railroad, which is about one-quarter of a mile from this section 13, for which these commissioners have been appointed, and that the nearest part of any parcel embraced in this report is about a half mile, and that the farthest part of any parcel in this section is less than a mile and a half.   The station at Olive Branch is only about 10 miles from the city of Kingston on the Ulster & Delaware Railroad, just a nice drive with a team and wagon. It is the duty of the corporation counsel to appear upon these proceedings, not in a merely perfunctory manner as seems to be assumed by one of the affidavits filed by the chairman of commission 13, but "to protect the interest of the city."   He is the sworn law officer of the great city of New York and is bound by his employment and the statutes to carefully look after its interests.

By section 5, c. 725, Laws 1905, it is provided as follows:

"In all such proceedings the commissioners of appraisal appointed thereunder shall receive as compensation such fees and expenses as may be taxed by the court upon notice to the corporation counsel.   The corporation counsel of the city of New York, shall either in person, or by such assistants or other counsel as he shall designate for the purpose, appear for and protect the interests of the city in all such proceedings in court, including the taxation of fees, compensation and expenses and proceedings before the commissioners. The fees of the commissioners and the salaries and compensation of their employees, and their necessary traveling expenses, and all other necessary expenses, in and about such proceedings to be had for acquiring title or extinguishing claims for damages, to real estate,  *  *  *  shall be paid by the comptroller of the city of New York out of the funds provided in such proceedings.   Such fees and expenses shall not be paid until they have been taxed before a justice of the Supreme Court in the judicial district in which the lands or some part thereof are situated upon eight days' notice to the corporation counsel of the city of New York."

Section 32 of chapter 724 is practically similar to this.   It will by an examination of these sections be seen that the only expenses that the court is authorized to tax and the comptroller of the city of New York to pay is the necessary traveling expenses of the commissioners after being taxed upon notice to the corporation counsel.

Some of these commissioners claim that automobiles were ordered by the corporation counsel's office until about September 1, 1909, and payment arranged by it for them to July 1, 1909, and then unpaid bills for July and August were refused to be taken care of by that office, and bills for those two months were made out to the commissioners instead.   This commission No. 13 has included in this account bills for automobiles said to have been used for inspection in parcels included in this and their prior report.   It is a little difficult for me to understand, if the corporation counsel's office ordered these automobiles, why that department is not allowed to take care of the payment therefor, and I cannot understand the necessity for the commissioners' assuming said bills.   I do not think that the use of automobiles is a necessary expense within the meaning of this section as applied to this commission or to any of the other commissions.   The Ulster & Delaware Railroad runs through nearly the center of the reservoir

section, and the Wallkill Valley Railroad and the Ellenville & Kingston Branch of the O. & W. Railroad go very near to all parts of the aqueduct and cross the same. Many trains are run during the summer season on this Ulster & Delaware Railroad, and there is a large livery at Brown's Station near Olive Branch which can be easily induced to send a rig to Olive Branch, the station in question here, and at all of these stations, with a little inquiry, and by letter or postal card a horse and carriage will meet the commissioners and take them speedily and cheaply to any part of their sections, and in the boarding season carriages meet all trains. This is the kind of necessary traveling expenses—i. e., the ordinary method of travel—in my opinion contemplated by the statute of 1905. Automobiles are not yet in common use. They are expensive. They are used by a few professional men and by some business firms, but for the most part they were in 1905 and are still on account of the great expense involved in their purchase and maintenance the dangerous plaything of the wealthy. I do not think there is a lawyer in the city of Kingston who, being summoned by his client residing in the Ashokan region to come to his residence to draw a will, deed, mortgage, or any of the business for which a lawyer is frequently called to his client's residence, would dare to go there in a hired automobile at $25 per day (the usual price inserted in these bills), and present such a bill for expenses to his client. He would go in the usual orderly, customary, democratic way by the railroad train, and would expect his client to pay for only such kind of conveyance. What a lawyer would not do for his private client these commissioners should not do at the proposed expense of New York City. It was suggested by one of the commissioners that, if the court disallowed bills for automobiles, car fare and horse hire should be allowed in place of said automobile bills. The court cannot do that It can only pass on the expenses submitted, and cannot substitute others.

In 1907 and 1908 it had been practically the universal custom of commissioners to travel to their sections in the way hereinbefore suggested—by train to the nearest station, and then take a carriage to the parcels. In many cases commissioners walked and preferred to do so from the Ulster & Delaware Railroad stations over their parcels. This land is in the heart of the Catskill boarding house and hotel region noted for its health-giving properties. Many people journey there every summer and pay for accommodations at such hotels and boarding houses, and spend their days driving and tramping over these identical lands that some of these commissioners desire to have an automobile to inspect, and such summer visitors are greatly benefited. This court can but feel that these commissioners who neglect to avail themselves of this great health-giving privilege of a walking or carriage riding examination of these parcels of land are losing a valuable part of the compensation that attaches to their office. Many of the earlier appointed commissioners utterly refuse to throw away such health acquiring and longevity insuring opportunities for the sake of being suffocated with gasoline fumes. The year 1909 was "Carnival" year in the Ashokan region. The roads leading from Kingston to

Ashokan (and nearly all roads did) were kept dusty, musical, and redolent with automobile speed, honks, and fumes, from automobiles used by some (but not by all) the commissioners. Justice Howard took a hasty glance at Ashokan environments during the year 1909. Further quoting from his opinion hereinbefore quoted from, what he saw there impressed that learned jurist as follows:

"It is the system, not the commissioners, that is most deserving of reproof. Many of the faults charged against the commissioners are the result, not of their shortcomings, but of the law which created them and the conditions which surrounded them. This whole project of the condemnation of land in the Ashokan Valley is characterized as waste, disorder, and confusion. There is no system and no plan for doing anything. Nobody seems to be in charge of the matter, and the result is an endless muddle and mix-up. Sometimes as many as 10 commissions I am told are convened at Kingston to hear testimony in one day with only five, generally only three, representatives of the corporation counsel's office. available for service before them. The result is that five commissions are waiting without work while the attorneys are engaged before the other five. This, of course, results in much waste of time and brings about many adjournments which the commissioners are powerless to prevent. And even out of these five attorneys available in Kingston some are assigned to do work in Newburgh. And frequently, when the commissions have met with the full intention of proceeding with their work, it also happens, as I am advised, that attorneys representing the claimants are not for good and sufficient reasons perhaps prepared to proceed. And again it happens often, so the members of the commission inform me, that there is no place provided for so many commissions to sit at one time, and they are forced to convene in halls and corridors and attics and other inconvenient and improper places. Many such contingencies force the commissions oftentimes into an adjournment which they are reluctant to grant, and which they are not responsible for."

I am not especially impressed with the argument made by some of the commissioners that because some assistant to the New York corporation counsel's office furnished during the early part of 1909 and until September 1 of 1909 automobiles for use of certain commissioners, and included the expense thereof in his own bill, that, when that support was withdrawn, the commissioners were justified in continuing to incur that unnecessary expense, that the city of New York would be or is estopped from declining to pay for such luxuries for these commissioners without notice. The picture of an assistant corporation counsel forcing an unwilling commissioner into an automobile and compelling him to ride to Ashokan is, of course, impressive, and when to that is added the further alleged fact that after the commissioner had acquired the automobile taste and liked it that it was wrong for the hard-hearted city of New York to discontinue so pleasing a custom, without serving at least eight days' notice of such intention on such commissioners, it detracts nothing from its impressiveness, but that is not the way valid claims against a municipality are usually established.

In the physical world those who go the pace must pay the penalty. Although many matters look differently the day after, yet few grown men lay the blame entirely to the mixer of the deceptive beverage! Even Eve is not now considered the only one worthy of blame! The fact that the corporation counsel's office declined to longer pay these bills should have been notice to these commissioners that it would be

prudent for them to return to more public and less exclusive conveyances, and that what the corporation counsel's office declined to do for itself it was extremely unlikely to do for others or approve of, if done by them.

The claim for automobile hire is disallowed. The other expenses having been itemized on the request of the corporation counsel are allowed. The amount allowed to the commissioners for their services is $2,100 apiece, and for their expenses is: For Commissioner Mead $263.65, for Commissioner Williams $253.15, and for Commissioner Brady $287.83. Even after deducting the automobile hire, these commissioners fare very well in the matter of expenses as compared with prior commissioners living in their immediate vicinity. Commissioner Mead, who resides in Albany, had heretofore been allowed $187.43 for his expenses on his first separate report for 40 days' service. His expenses submitted here are $263.65, which added to one-third of the proposed automobile expenses, $153.33, amounts to $416.98, or a claim for $604.41 for expenses in the two reports. He is allowed for his prior report and his expenses amounting to $451.08 for 93 days. Instead of nearly $7 per day for expenses as asked, he is allowed practically $5 per day. Commissioner Smith, one of the commissioners of appraisal in section No. 2, who lives in the same city (Albany) as commissioner Mead, was allowed a total amount for his expenses as stated in his bill of $364.72 for his first and second report, which included 100 days' service, or the amount of $3.64 per day. Commissioner Williams presented a bill for $651.62 for his expenses on his first, and this report, charging him with one-third of the proposed automobile bill, and for 40 days on prior report; it would be something over $7 per day asked for. He is allowed $498.29 for 93 days' expenses on this and his prior allowance by Justice Fitts, which is over $5 per day. Commissioner Patten, one of the commissioners of appraisal in section No. 5 who lives in an adjoining town to and about four miles from Mr. Williams and four miles farther from the city of Kingston and the Ashokan region, was allowed expenses in his first and second report of $253.76 for 108 days' service or less than $2.50 per day. I do not think that either Commissioners Smith or Patten were attempting to make any display record for economy in the bills for expenses submitted and allowed, and they could not have well expected the comparison that is now made. Many commissioners residing in New York City have been allowed much less for expenses than has Mr. Brady for an equal number of days, so that neither of the commissioners in section No. 13 can claim that their bill for necessary expenses has been unduly or unreasonably cut. If any further bills from this commission are submitted to me for taxation, I shall expect more detail as to services and careful items as to disbursements. "Carnivals" are expensive. The city of New York, like an awakening giant, is now trying to settle and adjust and pay at as reasonable a rate as can be for the joy rides, haste, confusion, and mistakes of the carnival period. It should be assisted and not hindered by the court and commissioners. A wise and economical mayor, an alert corporation counsel, and a much more quiet board of

water supply should have their hands strengthened instead of further incumbered. I think the commissioners will all be disposed to be helpful.

An order may be handed up fixing the compensation and disbursements of commission No. 13 in accordance herewith.